# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA <br><br>          Plaintiff, <br><br> vs. <br><br> BRENNAN NORDEN, <br><br>          Defendant. | 3-06-cr-00038-RRB-JDR <br><br> **RECOMMENDATION** <br> **REGARDING** <br> **MOTIONS  TO  SUPPRESS** <br><br> (Docket Nos. 26 & 31) |

Defendant **Brennan Norden** moves to suppress all evidence derived from the search and seizure of an express mail package and of his residence at Kasilof, Alaska.  Docket No. 26.  He also moves to suppress statements he gave to law enforcement officers on December 28 and 29, 2005, and any evidence derived from those statements.   Docket No. 31.   The motions are opposed by the government.   Docket No. 40.   An evidentiary hearing was conducted before the magistrate judge.  Upon due consideration of the evidence adduced and arguments

of the parties the magistrate judge recommends that the court adopt findings of fact and conclusions of law as set forth below and further that the defendant's motions to suppress be GRANTED and DENIED as set forth below.

### Findings of Fact

On or about December 18, 2005 Guy Tavoliero, Special Agent for Immigrations and Customs Enforcement, (ICE), formerly U.S. Customs Service was notified by his supervisor that agents at the Sea-Tac International Mail Facility had performed a border package coming from Canada. A sample test of some of the contents of the package had proved positive for MDMA, Ecstasy. The package was forwarded by DHL to Tavoliero's office in Anchorage.

Investigator Joseph Gamasche, a deputized federal agent through the Federal Drug Enforcement Agency (DEA) and a member of the DEA Drug Task Force performed an investigation of Brennan Norden, the person believed to be the intended recipient of the package. According to the DEA investigation Brennan Norden had previously received a package addressed to him that was intercepted in Canada and contained hash oil and some other controlled substances. The Vancouver Police Department had previously been contacted by Federal Express Officials concerning a suspicious package addressed to Brennan Norden, 21577 Elysabe Street, Kasilof, Alaska. The package contained one pound of hallucinogenic mushrooms, one-quarter pound marijuana and three vials of hash oil.

When SA Tavoliero ran Mr. Norden by name and date of birth the record reflected that he had previously been involved with a shipment of Valium and Diazepam from Canada.   The TESC (Treasury Enforcement Communication System) recorded the seizure performed by customs under the authority of a border search for international shipment.   The agents learned from APSIN (Alaska Public Safety Information Network) that Mr. Norden's residence was at 21577 Evalen Way, Kasilof, Alaska.  The correct spelling of the address is Evelyn May, not Evelyn Way.

The outer container of the subject package was a soft envelope.   It contained a board game, "Risk" and 493 Ecstasy pills in five bags with about 100 pills in each bag.  The agents kept the original bags in which they placed a sham substance and one representative pill.   The package was mailed to a general delivery address not that of a residence.   The address was actually that of the Kasilof Post Office.   The package was addressed to "Brennan Norden, Kasilof, Alaska 99610, USA, Merry X-Mas." Testimony of Inv. Gamasche, October 26, 2006, Evidentiary hearing, p. 47.  It did not contain a street address.

The agents wired the package for shipment as addressed.   SA Tavoliero obtained a court order from a United States Magistrate Judge to retrieve the package and the beeper after the beeper alerted them that the package had been opened.   The package was placed in the Kasolif, Alaska Post Office on the morning of December 28, 2005.

Because Mr. Norden had made a request earlier in December to the Post Mistress at the Kasilof Post Office about a package he expected to receive from an aunt, the post mistress placed a telephone call to Norden informing him that a package was waiting for him at the post office.   With respect to delivery of the package the agents tried to direct what was normally expected by the intended recipient.  They surmised that a delivery of the package to Norden's house would appear to be outside the scope of what he would have expected since the package was not addressed to the residence.  According to Carrol Marsh, postal clerk at the Kasilof Post Office it is  not unusual for a postal employee at that post office to call a local resident and inform him that a package that he was looking for has arrived when the person is someone known to the postal employee.  Norden was known to her.

DEA Agents conducted pre-delivery surveillance at the Post Office in Kasilof in anticipation of Mr. Norden's arrival.   The troopers also supplied the surveillance team with a hand drawn schematic showing Norden's residence.  The agents had a physical description of Norden and knew that he owned a blue pickup truck.

During their surveillance they noticed Norden's blue truck arrive and leave the post office after Norden retrieved several packages inside the post office.

After Norden picked up the package at the post office he was under surveillance until the package was taken to his residence.

Norden took delivery of two packages in addition to the package being monitored by the agents.  One package was from Norden's uncle and another from his aunt.  The suspect package was addressed to Norden with an "a", not with an "e".   Agents followed the pickup truck to a feed store and then to the driveway of Norden's home in Kasilof.

About ten minutes after Norden arrived in his home the radio signal in the package changed from a steady signal to the alarm mode indicating to the agents that the integrity of the package had been altered.  An entry team of law enforcement officers was assembled and the agents approached the residence. One of the officers knocked and announced their presence at the front door.  Nobody answered the door and after about 15-20 seconds without hearing any response the officers forced open the door and entered the residence.  The team immediately performed a security sweep inside the house to locate anyone who might be present.  The agents encountered Norden and commanded him to get down on the floor with his hands behind his back.  Norden was cuffed and pulled to his feet.  He was instructed to sit in a chair.  The agents told he that he was not under arrest but Norden felt anxious and confused because he had been placed in handcuffs.

During the security sweep the officers observed the game board on the floor in a small bathroom.  The package had been opened and game pieces were scattered in front of the toilet.  The Ecstasy pill and sham drugs were not present. Mr. Norden was the sole occupant of the residence when the entry was made by the officers.  During the security sweep officers observed across from the bathroom a marijuana grow room.

A search of Norden's person revealed that he was carrying some medication.  Norden informed the officers that he needed to have his medication with him.[1]  He also told DEA Agent John Solek, Jr., that he possessed a marijuana user's card.  I reject Norden's statements that the officers "refused him his medication." From the totality of the evidence I find that he told the officers he was not due for medication at that time although he wanted to make sure his medication accompanied him when he was escorted away from his residence.  Agent Tavoliero asked him if he was due to take his next dosage and Norden told him that he was not.  SA Tavoliero retained possession of the prescription drugs and told Norden that once he was fingerprinted they would be returned to him which they were.  Mr. Norden was also told that once he was fingerprinted he would be free to leave.

---

[1] Norden's medications (not all on his person) included Diazepam, commonly known as Valium,  Zanax, Tegretol, and Marinol (marijuana in a pill form).

Mr. Norden was escorted by Investigator Gamasche and SA Tavoliero to Gamasche's vehicle and transported to the Soldotna Trooper Station.    Mr. Norden and SA Tavoliero sat in the rear of the vehicle. Inv. Gamasche was not equipped with a prisoner shield between the front and back seats.  Norden's trip to the Soldotna Trooper's Station was not voluntary on his part.  He was not asked whether he wanted to accompany the agents; rather he was detained and taken in handcuffs to the Trooper Station.

While in route to the Trooper Station SA Tavoliero told Mr. Norden that he had the right to remain silent, anything he said could be used against him in a court of law, and that he had the right to contact an attorney at any time. Transcript of October 30, 2006 Evidentiary Hearing, p.67.  Mr. Norden asked a variety of questions and was told to hold his questions until they reached the trooper station.

After the house was secured Alaska State Trooper Hieren left the premises to seek a search warrant for the residence.  Five or six officers waited inside the residence in anticipation of the issuance of a search warrant.  They chose to wait inside because it was in the middle of winter and there was a lot of ice outside, the residence was in a remote area with 35 dogs chained in the yard, and the officers concluded that it would be too difficult to secure the premises unless they were in close proximity to it.  The residence is located at the end of a dead end

street.  The 247 foot driveway was covered in ice and several vehicles had actually skidded off the driveway earlier that day.

At the Trooper Station Investigator Gamasche fingerprinted Norden. The agents then asked Norden if he would like to speak to them voluntarily.  Norden was never given an option whether to be fingerprinted. Norden was told after the fingerprinting that he could leave at any time but he did not feel that he was free to go.  Although Norden was told that he was not under arrest he clearly was detained when he was escorted to the interview room.  The interview was not recorded.  At one point Norden told the agents that he wanted to speak to his attorney and the interview terminated.

SA Tavoliero began the interview by telling Norden the circumstances as he knew them indicating that Norden had arranged for a shipment of MDMA from Canada.  The agent also confronted Norden with the fact that upon the package being opened the MDMA had been replaced with sham MDMA.  The agent told Norden that he believed that he had flushed some of the evidence down the toilet. Norden asked what he could get in return for his cooperation; he wanted to be "exonerated."  The agent told Norden that he could not negotiate or give him any exoneration or immunity as that was beyond his authority. During the  interview Norden stated that he had bought the game.    Norden stated that he wanted to talk

to an attorney.  SA Tavoliero then handed Norden his business card and Norden stated that after he talked with his attorney he would call the agent.

During the execution of the search warrant of the residence Norden called SA Tavoliero and the agent informed him that his truck was subject to forfeiture.  He was told that whether forfeiture occurred could be dependent on his cooperation.

Norden was advised of some of the <u>Miranda</u> rights by SA Tavoliero during his transportation to the Trooper post and against after he was seated in the interview room.  The agent did not read the rights from a card.  Norden was never specifically told that he had the right to have an attorney present with him while he was being questioned.   He was told at the Trooper Post that if he wanted an attorney he could phone an attorney (Agent Gamasche testimony, October 26, Evidentiary Hearing, p. 27-28.)   He was not advised that if he could not afford to have an attorney present with him while he was being questioned, one would be appointed for him by the court.  *See*  October 26, 2006 Transcript, pp. 27-28; October 30, 2006 Evidentiary Hearing, p.120-121.  After the interview the agents asked Norden where he wanted to go and they dropped him off in front of the Safeway Store in town.

//

//

**Discussion**

### 1.    Border Search of Mail

Custom Agent Guy Tavoliero was informed that Customs and Border Protection (CBP) inspectors seized and searched a package at the International Mail Facility at Seattle-Tacoma International Airport.    The package was sent from Vancouver, Canada to Kasilof, Alaska.  The package label contains a USA Customs Declaration describing the contents as a board game.  Norden argues that because the package appears to be a standard plastic envelope provided by the postal service for express mail-type packages, the customs inspectors needed reasonable suspicion to open the package.  Packages arriving as international mail are subject to search by customs agents as permitted by 19 C.F.R. § 145.3(a).[2]  The shipping document which the customs agent undoubtedly viewed for purposes for determining whether to inspect the package clearly alerted the customs agents to the possibility that the package in question contained merchandise.  The air bill identifies the contents of the package as a board game.  The regulation permits

---

[2]Section 145.3(a) provides:
"§ 145.3 Opening of letter class mail; reading of correspondence prohibited.
   (a) Matter in addition to correspondence. Except as provided in paragraph (e), Customs officers and employees may open and examine sealed letter class mail subject to Customs examination which appears to contain matter in addition to, or other than, correspondence, provided they have reasonable cause to suspect the presence of merchandise or contraband.

searches, provided that agents have reasonable cause to suspect the presence of merchandise or contraband.  The search of  international mail is reviewed under the same legal standard as a border search.  United States v. Ani, 138 F.3d 390, 391-392 (9th Cir. 1998).   The same constitutional standard applies to envelopes that are mailed.  United States v. Ramsey, 431 U.S. 609, 619-20 (1977).  No constitutional violation has been shown by Norden by virtue of the customs inspection of the package.

### 2.    Installation of Monitoring of Electronic Device.

Once the agents found the drugs, they certainly had a reasonable basis to obtain court permission to re-pack the package to include a warning device and prepare for a controlled delivery.  See, e.g., United States v. Brock, 667 F.2d 1311, 1317–1322 (9th Cir. 1982); United States v. Dubrofsky, 581 F.2d 208, 211 (9th Cir. 1978). On December 27, 2005 Guy Tavoliero, Special Agent, Bureau of Immigration and Customs Enforcement [BICE] applied for and received an order from the magistrate judge authorizing the installation and monitoring of an electronic alerting device as a physical surveillance aid in case No. A05-252-MJ(JDR).

The application and affidavit sought an order for the installation and monitoring of an electronic alerting device to aid the officers in knowing when a suspect(s) opens the package to examine or remove the substance resembling the 493 tablets of MDMA (Ecstasy) from the package.  The application explained that

the electronic alerting device emits a radio signal when the package is opened.  This alerting device does not record, monitor or transmit any form of communication.  According to the application, officers of ICE, the Drug Enforcement Administration and other law enforcement officers planned to retrieve the package and make appropriate application with the court for further law enforcement action after being alerted by the electronic device that the package had been opened.  The Order recites that there is probable cause to believe that Mr. Norden engaged in violations of drug trafficking and customs laws, that the package contained MDMA and that an electronic alerting device would assist law enforcement officers in surveillance and determining the moment at which the package is opened.  Pursuant to 18 U.S.C. § 3117(a) the Order authorized members of ICE in conjunction with local law enforcement officers to install, monitor and utilize an electronic alerting device within the described package, either on public or private property, for a period of three days, or whenever the investigation would end, whichever occurs sooner.  The authorization was for either day or night.

18 U.S.C. § 3117(a) provides: "If a court is empowered to issue a warrant or other order for the installation of a mobile tracking device, such order may authorize the use of that device within the jurisdiction of the court, and outside that jurisdiction if the device is installed in that jurisdiction."  The term "tracking device"

includes an electronic device which permits the tracking of the movement of an object. Section 3117(b).

The Order does not purport to be a search warrant or an anticipatory warrant for any location where the package may be taken by its recipient. The government does not argue otherwise. The government does not rely upon the Order as authority to enter and search Norden's residence.

Norden argues that the agent's monitoring of the electronic signal from inside Norden's residence required the prior issuance of a search warrant for the residence. He cites United States v. Karo, 468 U.S. 705, 104 S.Ct. 3296 (1984). In Karo a Drug Enforcement Administration agent learned that defendants Karo, Horton and Harley had ordered 50 gallons of ether from a government informant who had told the agent that the ether was to be used to extract cocaine from clothing that had been imported into the United States. The government obtained a court order authorizing the installation and monitoring of a beeper in one of the cans of ether. The ether was moved in succession to several locations. Using the beeper monitor, agents determined that the ether can with the beeper inside was inside a house and obtained a warrant to search the house based in part on information derived through the use of the beeper.

The Supreme Court rejected the government's contention that it should not be bound by the constraints of the Fourth Amendment to determine by means

of an electronic device without a warrant and without probable cause or reasonable suspicion whether a particular article was in the individual's home at a particular time. *Id.* at 3303-04. The Supreme Court also rejected the government's contention that it should be able to monitor beepers in private residences without a warrant if there is the requisite justification in the facts for believing that a crime is being or will be committed and that monitoring the beeper wherever it goes is likely to produce evidence of criminal activity. In Karo, the agents verified that the ether was actually located in a particular house where it remained while a warrant was sought.

Karo holds that when the beeper is activated to track the movements of a container then privacy interests are implicated. In the instant case the agents obtained a warrant before they installed the electronic device and monitored the movement of the package from possession of the postal service to Norden's private residence. Although the order issued was not a search warrant it was issued based upon a finding of probable cause to allow the monitoring of the package if and when it should be carried by the recipient to the Norden residence. The monitoring of the electronic signal from inside Norden's residence did not violate the Fourth Amendment even though the order did not authorize the agents' search of the residence by other means. Karo held that the agents could not enter a residence where a monitoring beeper had been surreptitiously introduced while it was still in

3-06-cr-00038-RRB-JDR NORDEN @26 & 31 RR Re Motions to Suppress.wpd

14

the search house without a warrant.  There was no issue in that case about the existence of any exigent circumstances to excuse the need for a search warrant. The court reiterated the long standing principle that warrantless searches are presumptively unreasonable although it acknowledged that "a few limited exceptions to such general rule have been recognized."  468 U.S. at 717, citing Warden v. Hayden, 387 U.S. 294 (1967)(exigent circumstances).

The government had argued that the traditional justifications for the warrant requirement are inapplicable in beeper cases on the basis that the beeper constituted only a minuscule intrusion on protected privacy interests.  The high court rejected that argument.  The Supreme Court found it "worthy of note" that Karo was not a particularly attractive case in which to argue the impracticality of obtaining a warrant since a warrant was in fact obtained in that case.

### 3.    Entry into Norden's Residence

After receiving the package at the Kasilof Post office Norden stopped at a business for a few minutes and then drove his truck to his residence.  Less than ten minutes after he arrived the electronic alerting device broadcasted a signal indicating the package had been opened.  Law enforcement officers assembled an entry team and approached the front door.  A member of this team knocked on the door of Norden's residence and performed a "knock and announce."  About 15 - 20 seconds after the agent's knock and no one appeared at the door, a forced entry

was made into the residence.  Entry was made without the prior issuance of a search warrant.

During the security sweep by the officer Norden was located at the top of the stairs and told to lie down on the floor.  During the security sweep the package was observed in a bathroom in the basement of the residence.  The package had been opened.  Game pieces were scattered near the toilet.  The sham MDMA and one pill were not found.

Norden argues that the officers should have sought an anticipatory warrant before entering.  The government relies upon exigent circumstances for the warrantless entry.

An "anticipatory warrant" is a warrant based upon an affidavit showing probable cause that at some future time certain evidence of a crime will be located at a specified place.  United States v. Grubbs, 126 S.Ct. 1494, 1498 (2006).   The warrant may subject its execution to a condition precedent other than the mere passage of time.  It is axiomatic that a showing of probable case requires a showing of a fair probability that contraband or evidence of a crime will be found in a particular place.  Illinois v. Gates, 462 U.S. 213, 238 (1983).  As the Supreme Court explained in Grubbs the probable cause requirement looks to whether the evidence will be found when the search is conducted not at the time the warrant is issued.  The facts of the affidavit supporting the search warrant must be sufficiently close in

time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist at the time of the search and not simply as of some time in the past.  United States v. Wagner, 989 F.2d 69, 75 (2nd Cir. 1993).

Grubbs identifies two prerequisites of an anticipatory warrant to comply with the Fourth Amendment's requirement of probable cause.  First, there must be a fair probability that contraband or evidence of a crime will be found in a particular place if the triggering condition occurs.  Second, there must be probable cause to believe that the triggering condition will occur.  126 S.Ct. at 1500.  In Grubbs the Ninth Circuit's opinion was reversed because the Court of Appeals had invalidated the anticipatory search warrant at issue for the reason the warrant failed to specify the triggering condition.  The anticipatory search warrant in Grubbs authorized the search of defendant's residence on the basis of an affidavit stating that the warrant would be executed upon delivery of a video tape containing child pornography.  The Supreme Court noted that a successful delivery of the video tape would have established probable cause and although the defendant could have refused delivery of the video tape he had ordered, it was unlikely that he would do so.  The court held that the Fourth Amendment did not require that the triggering condition for an anticipatory search warrant be set forth in the warrant itself.  The Fourth Amendment's particularity requirement does not include the conditions precedent to execution of a search warrant.

The instant case is readily distinguishable from <u>Grubbs</u> in that the officers decided not to make a controlled delivery of the package to Norden. It could not be anticipated with fair probability where Norden would take the package after receiving delivery of it at the post office. He might have opened it in his truck or taken it to some unidentified location.

Norden argues that the agents should have made a controlled delivery of the package to Norden's residence thereby increasing the probability that the package would be opened at a particular place, namely the residence where it was delivered. It is clear from the testimony of the clerk and postmaster of the Kasilof Post Officer the package would not have been delivered to Norden's residence had it not been intercepted by customs and law officers. There would have been no personal delivery of the package to the residence because the Kasilof Post Office is a non-city delivery office. It has no contract for delivery by carrier.

The law officers were entitled to pursue delivery of the package in its usual manner and it was reasonable to conclude that under the circumstances of this case a telephone call to Norden by a postal employee of the Kasilof Post Office informing him of the arrival of a package for him was reasonable. Norden had previously inquired about a package that he was anticipating so it was not unusual for the post master to notify Norden when the package arrived. It was normal and customary for the package to be delivered to Norden in the manner of a general

delivery at the post office. Norden cites no case authority requiring the government to have sought an anticipatory search warrant for the defendant's residence when it is just as likely that the contraband or evidence of a crime would be found elsewhere than in the residence itself.

The officers lawfully secured the premises while a State search warrant was sought for the residence. I reject the argument that exigent circumstances were unlawfully created by the government by not seeking an anticipatory search warrant. Norden argues that if the officers had done a controlled delivery of the package to the residence they could have assumed the fair probability of contraband being found at a predetermined location. He further argues that because the pills were packaged about 100 to a package the officer should have expected that the pills would be repackaged prior their distribution and that such repackaging would likely occur at the "dealer's house," namely the defendant's residence. He claims that the officer should have reached this conclusion because a previous package of drugs had been sent to Norden on an occasion not connected to this investigation. The subject package was not addressed to Norden's residence. The officers were not required to deliver it in a manner or location inconsistent with the labeling on the package. The government did not control where the package would be taken after its receipt by Norden. Under the circumstances of this case the agents were not

required to speculate about whether Norden would open the package at his residence.

The government bears the burden of showing the existence of exigent circumstances by particularized evidence in order to justify departure from the need to obtain a warrant. *See* United States v. Alvarez, 810 F.2d 879, 881 (9th Cir. 1987). Factors relevant to an evaluation of exigent circumstances include: (1) the degree of urgency and the amount of time necessary to obtain a warrant; (2) the officer's reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to officers guarding the sight; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband. *See* United States v. Turner, 650 F.2d 526 (4th Cir. 1981). These factors are discussed below.

In the instant case Norden had been observed entering his residence but did not answer the door after the officers conducted a knock and announce. It is possible that Norden upon opening the package recognized that it had been altered. The ecstacy pill could be easily removed and destroyed. In Welsh v. Wisconsin, 466 U.S. 740, 104 S.Ct. 2091 (1984) the Supreme Court held that an important factor to be considered in determining whether any exigency exists for a warrantless entry is the gravity of the underlying offense. In Welsh the court held that a warrantless night time entry into an individual's home to arrest him for the

violation of a civil non-jailable traffic offense violated the Fourth Amendment.  Here, the possession of a controlled substance with intent to distribute is a serious felony offense.  Viewed from the totality of the circumstances known to the officers at the time of the warrantless intrusion,  I conclude that a reasonable person would believe that entry was necessary to prevent the destruction of relevant evidence and the officers were justified in departing from the warrant requirement.  I am satisfied that the government has shown that a warrant could not have been obtained in time. The government has met its burden of showing the existence of exigent circumstances. Exigent circumstances existed because the facts as a whole gave the officers probable cause to believe that the occupant(s) (Norden) might destroy evidence before a search warrant was obtained.  There existed specific and articulable facts which together with rational inferences supported the warrantless intrusion.

The officers had probable cause to secure the residence while applying for a search warrant for Norden's residence.  Upon securing the premises while a search warrant was sought the officers waited inside the residence without conducting a search of it.  The building was located in a rural setting in a forested area and their retreat outside would have left them vulnerable and the premises not secure.

The officers had probable cause to believe that contraband had been mailed to a post office under a false name. Until the package arrived at the

residence they did not have probable cause to believe that it would be taken to the residence.   Once the alarm went off it is clear that the officers knew that whoever opened the package would suspect that the parcel had been tampered with and that the police were close at hand.  See, e.g., United States v. Gallo-Roman, 816 F.2d 76, 79-80 (2d Cir. 1987).  See United States v. Hackett, 638 F.2d 1179, 1182 (9th Cir. 1980) (finding exigent circumstances excusing absence of warrant in a case with very similar facts).

Once Norden had reason to believe that his package had been tampered with he had significant motivation to destroy any evidence.  There is no indication that a warrant could have been obtained more rapidly here than was the case in Hackett.  The officers could not rule out the possibility that someone else was in the residence.   It is not unreasonable to believe that others would be involved here in Alaska, as well as in Canada.  The Ninth Circuit has been very strict with regard to anticipatory warrants.  At the time the warrant issues the magistrate judge must be able to determine that there is probable cause that the items to be seized are at the premises to be searched.  United States v. Hendricks, 743 F.2d 653, 654-55 (9th Cir. 1984).  United States v. Ricciardelli, 998 F.2d 8, 12 (1st Cir. 1993) (identifying two conditions for anticipatory warrants: 1) The triggering event must be ascertainable and pre-ordained and 2) the contraband must be on a "sure and irreversible course to its destination, and a future search of the destination must

be made expressly contingent upon the contraband's arrival there"); accord <u>United States v. Ruddell</u>, 71 F.3d 331, 333 (9th Cir. 1995).

Mere knowledge that Norden received mail at the Kasilof post office and that he lived at a particular address would be insufficient under <u>Hendricks</u> because the package was not correctly addressed to Norden and was addressed to a post office rather than his residence.   The alert went off soon after Norden arrived at his residence.   Until this happened it was possible that Norden was simply keeping the package for someone else.   Once the "alarm" went off, it was reasonable to assume that Norden was directly involved, knew that the package had been modified and would be highly motivated to destroy any evidence.

### 4.    Defendant's Statements

The <u>Miranda</u> rule was instituted as a prophylactic one against the self-incrimination Clause in the Fifth Amendment Clause to the U.S. Constitution.[3]   The Fifth Amendment prohibits use by the prosecution in its case-in-chief of compelled testimony.    Under <u>Miranda</u>, a person in custody must be informed before interrogation that he has a right to remain silent and to have a lawyer present.   *Id.* If the suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself

---

[3] <u>Miranda v. Arizona</u>, 394 U.S. 436 (1966).

reinitiates the conversation.  <u>Davis v. United States</u>, 512 U.S. 452, 458 (1994), citing <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981).

Notwithstanding the agents' explanation that Norden was told he was not under arrest when he was given the advisement of rights, a reasonable person in Norden's shoes would clearly believe that his freedom was curtailed to the degree associated with a formal arrest.  Norden was entitled to be advised of his rights for purposes of <u>Miranda</u> even though the agents told him that he was not under arrest at that time.   Norden did not go to the Trooper station voluntarily; rather was taken in handcuffs in a police vehicle without his consent.

During the advisement of rights Agent Tavoliero informed Norden that he had the right to remain silent; that anything he said could be used against him, and that he had the right to contact an attorney at any time.  This advisement was given while Norden was being transported to the Trooper Post.  Norden asked several questions while en route and Special Agent Tavoliero told him to wait until they got to the Trooper headquarters to ask questions.  At no time was Norden advised that he had the right to have an attorney present with him during the questioning nor was he told that if he could not afford an attorney one would be appointed for him if he requested an attorney.

The government argues that the advisement of rights was sufficient and that Norden understood his rights as evidenced by the fact that he invoked his right

to talk to an attorney.  In proper context Norden did not "invoke" his right to have an attorney present during any questioning.  Rather, he chose not to elect whether "to cooperate" with the agents until after he could talk to his attorney about that topic. Had Norden been fully advised of his right to have an attorney present to represent him he could have chosen not to provide any "incriminating remarks" upon receiving advice of counsel.[4]

A waiver of <u>Miranda</u> rights cannot be found from the suspect's continued response to questions, even if he is again advised of his rights.  <u>Smith v. Endell</u>, 860 F.2d 1528, 1529 (9th Cir. 1988), citing <u>Edwards</u>, 451 U.S. 484-485. Clearly, then, a waiver cannot be found where the suspect in custody has not been informed of his right to have a lawyer present.

The government has stated on the record that it does not intend to offer any statements made by the defendant prior to Agent Tavoliero's advisement of <u>Miranda</u> rights given to Norden at the Trooper station after he had been fingerprinted.  Because I find the <u>Miranda</u> advisement insufficient as a matter of law I do not reach the defendant's argument that the environment of the trooper post became coercive thus rendering Norden's statements involuntary.

-----

[4] Agent Tavoliero claims that Norden admitted knowing where the pill press was located.  Norden claims he said "<u>If</u> I know where the pill press is located, what can the government do for me if I tell you?"

For the foregoing reasons, the defendant's **Motion to Suppress evidence obtained from his residence, Docket No. 26, should be DENIED.**  The **Motion to Suppress statements made by him to law enforcement officers on December 28, 2006, Docket No. 31, should be GRANTED.**  IT IS SO RECOMMENDED.

DATED this 8th day of November, 2006, at Anchorage, Alaska.


 /s/ John D. Roberts
JOHN D. ROBERTS
United States Magistrate Judge


Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than **NOON, Wednesday, November 15, 2006**.  Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal.  McCall v. Andrus, 628 F.2d 1185, 1187-1189 (9th Cir.), cert. denied, 450 U.S. 996 (1981).  The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation United States v. Howell, 231 F.3d 615 (9th Cir. 2000).  Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers.  Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support.  Response(s) to the objections shall be filed on or before

3-06-cr-00038-RRB-JDR NORDEN @26 & 31 RR Re Motions to Suppress.wpd

26

**NOON, Tuesday, November 21, 2006**.   The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).

Reports and recommendations are not appealable orders.  Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment.  See Hilliard v. Kincheloe, 796 F.2d 308 (9th Cir. 1986).